KEKER & VAN NEST, LLP
JOHN W. KEKER - #49092
ELLIOT R. PETERS - #158708
WENDY J. THURM - #163558
BROOK DOOLEY - #230423
710 Sansome Street
San Francisco, CA  94111-1704
Telephone:  (415) 391-5400
Facsimile:  (415) 397-7188

Attorneys for Defendant
WILLIAM S. LERACH

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM S. LERACH,<br><br>Defendant. | Case No. CR 07-00964-JFW<br><br>**SENTENCING MEMORANDUM OF WILLIAM S. LERACH**<br><br>Date:     Feb. 11, 2008<br>Time:     9:00 a.m.<br>Place:    Courtroom 16<br>Judge:   Hon. John F. Walter |

**PUBLIC VERSION**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................... 1

II.     LERACH'S MISCONDUCT AND ACCEPTANCE OF
        RESPONSIBILITY ................................................................................ 3

III.    LERACH'S EXEMPLARY CHARACTER ............................................ 5

IV.     LERACH'S CONTINUING VALUE TO HIS COMMUNITY .............. 21

V.      THE EXTRAORDINARY LIFE OF WILLIAM LERACH ................... 24

        A.      Pittsburgh ................................................................................ 24

        B.      California ................................................................................. 26

        C.      The *United Methodist Church* Case ...................................... 27

        D.      Pre-PSLRA Securities Cases ................................................. 28

        E.      The PSLRA—Representing Pension Funds ........................... 29

        F.      Corporate Governance Leadership ......................................... 33

        G.      The *Enron* Litigation ............................................................ 36

        H.      Consumer, Public Interest, and Human Rights Cases .......... 38

        I.      Lerach's Generosity ............................................................... 44

VI.     ACCEPTANCE OF THE PLEA AGREEMENT ................................... 48

VII.    AN APPROPRIATE SENTENCE ......................................................... 50

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Barr v. United Methodist Church,*
  90 Cal. App. 3d 259 (1979)................................................................27

*Cunningham v. California,*
  549 U.S. ___, 127 S.Ct. 856 (2007) ................................................2

*Gall v. United States,*
  552 U.S. ___, 128 S.Ct. 586 (2007) ................................................2

*Kimbrough v. United States,*
  552 U.S. ___, 128 S. Ct. 558 (2007) ...............................................2

*Mangini v. R.J. Reynolds,*
  7 Cal. 4th 1057 (1994) ....................................................................40

**Statutes**

18 U.S.C. § 3553..................................................................................2

**Other Authorities**

U.S.S.G. § 2J1.3 ................................................................................49

U.S.S.G. § 6B1.2(c) ...........................................................................50

# I.    INTRODUCTION

William S. Lerach has pled guilty to a one-count Information charging conspiracy to obstruct justice and make false declarations under oath in violation of 18 U.S.C. §371.  He voluntarily agreed to plead guilty and entered his guilty plea when no charges were pending against him.  Moreover, in pleading guilty, Lerach expressly waived potentially valid statute of limitations defenses to the crime charged.  He pled guilty to a charge which, absent that waiver, would have been time-barred.  The Plea Agreement spared all concerned a long contentious fight.  It also ended Lerach's legal career, required him to pay a large fine, and exposed him to incarceration.

In the Plea Agreement, Lerach and the government agreed to a sentencing range of 12-24 months.  They also agreed that Lerach could request that the Court impose a 12 month sentence, with half of the time served in prison, and the other half in home confinement.  Lerach also must pay $8 million in fines and penalties. This amount is far in excess of any monetary penalty suggested by the Sentencing Guidelines.  Moreover, as the Pre-Sentence Report recognizes, no person suffered any financial harm from Lerach's misconduct.  Presentence Investigation Report ("PSR") at 8, 20.

In the Presentence Report, the United States Probation Office determined that the applicable Guidelines (in effect at the time of Lerach's last involvement in the conspiracy) yield a sentence of 15-21 months, 2-3 years of supervised release and a fine of $4,000 to $40,000.  PSR at 4.  The Probation Office also acknowledged that the Guidelines sentencing range permitted the Court to utilize one or more of the following options in sentencing:  probation; imprisonment; probation with community confinement or home detention; or imprisonment followed by supervised release in either community confinement or home detention. The Presentence Report concludes that "a sentence at the low-end of the Guideline range, namely 15 months, is appropriate to provide just punishment to

reflect the seriousness of the offense, including the duration of Lerach's criminal conduct, and to promote respect for the law." January 14, 2008 Letter from Lorreta S. Martin, Chief Probation Officer, to the Court at 3.

The Sentencing Guidelines are no longer mandatory, but instead provide a "starting point" for the Court's sentencing decision. *Gall v. United States*, 552 U.S. ___, 128 S.Ct. 586, 596 (2007); *accord Cunningham v. California*, 549 U.S. ___, 127 S.Ct. 856, 867 (2007).   District courts are now required to consider the Guidelines, but should "tailor the sentence in light of other statutory concerns, as well." *Kimbrough v. United States*, 552 U.S. ___, 128 S. Ct. 558, 570 (2007).  As a result, the Court should consider all of the factors set forth in 18 U.S.C. § 3553(a).  *Gall*, 128 S.Ct. at 596.  The guiding principle of section 3553(a) is to arrive at a sentence that is "sufficient, but not greater than necessary" to accomplish the other sentencing goals set out in the statute.  18 U.S.C. § 3553(a).

The Court should not presume "that the Guidelines range is reasonable" but should "make an individualized assessment based on the facts presented." *Gall*, 128 S.Ct. at 587.   The Court need not find "extraordinary circumstances to justify a sentence outside the Guidelines range." *Id.* at 595.

The Supreme Court's recent decisions in *Gall, Cunningham* and *Kimbrough* significantly broaden the discretion of this Court to impose a less stringent sentence than the one suggested by the Guidelines.  In light of the conduct at issue, Lerach's acceptance of responsibility, his exemplary character and compelling personal history, and his continuing value to his community, Lerach respectfully requests that the Court impose a sentence of 12 months, served half in prison and half in home confinement.  Pursuant to the proposal of Dean Crossley of the University of Pittsburgh School of Law, Lerach further requests that, upon release

from incarceration and during his home confinement, he be permitted to teach at the University of Pittsburgh School of Law, on a volunteer basis.[1]

## II.   LERACH'S MISCONDUCT AND ACCEPTANCE OF RESPONSIBILITY

Lerach has admitted serious misconduct and pled guilty to a serious crime. However, the government has never identified any case that was filed that would not have been filed absent the paid-plaintiff scheme outlined in the Information and the Plea Agreement. Nor the filing of any frivolous or bad faith case. Nor any recovery that was diminished due to the misconduct. Nor any legal fee that was not earned based on the work actually performed and the results actually achieved in the cases encompassed by the investigation.

Moreover, it remains true that no overt acts have been identified as to Lerach for over a decade. The Private Securities Litigation Reform Act of 1995 ("PSLRA") changed the rules for securities class actions. It eliminated the "first to file" rule in favor of a "largest financial interest" test to select lead class plaintiffs. Institutional investors soon dominated, professional plaintiffs disappeared and so did the old ways of doing business in the securities class action bar. Lerach quickly represented more institutional investors than the rest of that bar combined—some of the largest institutional investors in the world—without any hint of impropriety. None of these plaintiffs were paid. Post-1995, Lerach achieved record-breaking recoveries for cheated investors, while forging new pathways in using shareholder litigation to achieve corporate governance enhancements.

The sole overt act in the Statement of Facts underlying the Plea Agreement occurred eleven years ago. And, as the Presentence Report correctly concluded, there is no evidence of any active participation by Lerach in any wrongdoing for

---

[1] Lerach further requests that he be permitted to surrender himself into custody and that he be designated to the Federal Correctional Institution in Lompoc, California.

SENTENCING MEMORANDUM OF WILLIAM S. LERACH
CASE NO. CR 07-00964-JFW

410707.01

1    many years.  *See*  PSR at 8 ("[T]he Probation Officer has researched the discovery

2    materials provided and found no evidence that Lerach personally committed any

3    overt acts after 2002 . . . .").  This demonstrates Lerach's self-rehabilitation and

4    that any sentence need not reflect any need to deter him from—or protect the

5    public from—further criminal conduct.  *See* 18 U.S.C. §3553(a).

6            The evidence confirms that Lerach did not actively engage in the conspiracy

7    for many years and that his prior active conduct was more limited than others

8    involved in the conspiracy.[2]  As to the late conduct involving plaintiff Howard

9    Vogel, no one—not Vogel, not David Bershad, not Steven Schulman—has said

10   Lerach knew of, authorized, or actually participated in the payments to Vogel in

11   late 2003, years after the passage of the PSLRA, after which Lerach concentrated

12   on reaching out to institutional investors, as to which there has never been any hint

13   of impropriety.

14           In fact, when the 2003 payments to Vogel were made, the criminal

15   investigation had been underway for almost two years and Lerach was represented

16   by counsel.  It defies reality to believe Lerach would have knowingly permitted or

17   actively participated in an illegal payment under such circumstances, especially

18   when he then represented almost exclusively institutional investors and was in the

19   middle of leading the prosecution of the *Enron* suit—the largest, most important,

20   and highest profile securities class action suit in the country.  Lerach's active

21   misconduct involved Cooperman and providing cash to Bershad in connection with

22   pre-PSLRA cases.[3]

23   _____

24   [2]      Lerach is referred to as "Partner B" in the various indictments, informations
     and plea agreements.  Any fact determined adversely to the defendant in a criminal
25   case including in the context of sentencing must be proven by prosecutors beyond
     a reasonable doubt, a standard the prosecutors here cannot meet, as to any post-
26   2004 conduct.  However, even if a lesser standard of proof is applied, the
     prosecutors have not established Lerach knowingly, actively participated in any
27   wrongdoing occurring after 2004.

28   [3]      Evidence relating to checks issued 19-22 years ago involving lawyers
     representing Lazar in other matters hardly shows active misconduct post-2002.  As

Lerach has accepted responsibility for his past misconduct.  Probation Officer Biandi Foy noted Lerach's acceptance of responsibility in her Presentence Report, *see* PSR at 10, and many others have commented on it.  Judge Edward J. Wallin (Ret.) notes, "I talked to Bill about the charge . . . .  When I expressed sympathy and suggested that he was being unfairly singled out, he quickly corrected me, said he had made a mistake, he was sorry for it, and that he was prepared to accept his punishment." (Ex. W-1).[4]  Similarly, Lerach's friend Rex Mhiripiri writes, "I have been alone with Mr. Lerach on a half dozen occasions. Bill had many an opportunity to speak against the Court, the Law, the prosecutors, or his 'adversaries.'  He did not.  I was amazed at the gracious manner in which he referred to all who were involved in his coming to where he must now pay for his mistakes." (Ex. M-7).  Finally, Lerach's former litigation adversary, Brad Karp, says, "Bill is the first to acknowledge that he made serious mistakes and crossed the line . . . he also has publicly and fully acknowledged those mistakes and, in keeping with his 'stand-up' nature, is prepared to pay the price. . . ." (Ex. K-2).

## III.   LERACH'S EXEMPLARY CHARACTER

Bill Lerach has led an extraordinary and—absent the charges pled to here— exemplary life.  He has enjoyed a remarkable, ground-breaking career.  His professional life has been characterized by a calling to stand up to and fight powerful interests on behalf of ordinary people and investors, large and small.  His professionalism, civility and trustworthiness, and adherence to ethical standards, even in the face of contentious, high-stakes litigations, are recognized by adversaries, colleagues and judges alike.  Young lawyers and employees praise his approachability, fairness and repeated acts of kindness, generosity, as well as his

---

to professional plaintiff William Weinberger, he died in 1992.

[4]      Unless otherwise noted, the exhibit numbers refer to the Letters in Support of William S. Lerach for Sentencing, filed herewith.

SENTENCING MEMORANDUM OF WILLIAM S. LERACH
CASE NO. CR 07-00964-JFW

410707.01

personal interest in them and their families.  Devotion to family, loyalty to friends, generosity to others, and an utter lack of pretense epitomize his private life.

Lerach's character and his decades of good works—and the support he enjoys in his community and from his friends and family—are manifest. Submitted herewith to the Court are letters from individuals from all walks of life which attest to Lerach's integrity, trustworthiness, and generosity.  These letters— from gardeners to judges, adversaries to colleagues, family members to friends—as well as young lawyers, firm employees and class members who have all benefited from Lerach's positive traits, are uniform in their praise.[5]  A few deserve mention at the outset:

*Former Federal and State Court Judges*.  Lerach has received praise and support from many judicial officials before whom he has appeared not only for his skill, preparation, and dedication to his clients' interests, but also his professionalism, civility, honesty and ethical behavior.

> "While I was on the San Diego Superior Court, Mr. Lerach appeared before me on several matters . . . .  He was always very well prepared, a fine lawyer and was highly ethical and honest in all his dealings with his adversaries and the Court."  *Hon. James R. Milliken, Judge, Superior Court of California (Ret.)* (Ex. M-10).

> ". . . I have mediated cases with Bill . . . .  He always conducted himself with the utmost skill and integrity . . . .  [H]is word was always considered to be 100% reliable."  *Hon. Daniel H. Weinstein, Judge, Superior Court of California (Ret.)* (Ex. W-5).

> "Bill is an incredibly tough negotiator on behalf of his clients during mediations but once a deal is made, a handshake is enough to confirm it . . . .  He is truly a person who, as my father used to say, could be trusted with an uncounted sack of money."  *Hon. Edward J. Wallin, Justice, California Court of Appeal (Ret.)* (Ex. W-1).

> ". . . Mr. Lerach always conducted himself in a highly professional manner in connection with his appearances in my court . . . .  He was always most deferential and respectable to the court and court staff.

---

[5]    In *Gall*, in upholding a sentence of probation, where the Guidelines called for 30-36 months of confinement, the Supreme Court stressed the "small flood" of letters from "Gall's parents and other relatives, his fiancée, neighbors and representatives of firms doing business with him, uniformly praising his character and work ethics."  *Gall*, 128 S.Ct. at 593.

In the courtroom he always demonstrated courtesy and fairness to opposing counsel and all parties appearing." *Hon. Robert P. Aguilar, United States District Judge (Ret.)* (Ex. A-3).

"I first met Bill Lerach in 1985 . . . . I was co-defense counsel . . . . Bill displayed and exercised professional competence and civility at all stages . . . . Subsequently, in my . . . capacity as a member of the bench, I found that Bill still displayed and exercised the same degree of professional competence and civility that I had come to know when we were advocates." *Hon. Dickran Tevrizian, United States District Court Judge (Ret.)* (Ex. T-1).

These same judges and mediators have noted Lerach's passionate and effective advocacy for his clients. According to Judge Wallin, Lerach "has been by far the most effective advocate for wronged investors in the history of our profession. When he takes on a cause, he spares no effort or expense and the results have frequently been amazing in situations that appeared virtually hopeless." (Ex. W-1). "There is no question but that he did outstanding work on behalf of his clients." Hon. Robert P. Aguilar (Ex. A-3).

The letter submitted by the Hon. Harry R. McCue, a retired United States Magistrate Judge, encapsulates what many have said of Lerach. Judge McCue writes:

"In the hundreds, if not thousands, of hours Mr. Lerach was in my presence litigating, arguing and persuading, whether in contested matters or settlement conferences, he displayed his true value system, his concern for others, his dedication to his clients, his regard for the law, his integrity, and his finely honed sense of fairness . . . . In my years of experience with him in this arena, he has been zealous in his representation of clients, tireless in his efforts to obtain the true facts, respectful and strictly compliant with the courts' directions, and civil and cordial to his opposing counsel . . . . I can sincerely state that the Bill Lerach whom I have observed in his best and worst moments, in the heat of litigation battles, moments of defeat and moments of victory, is a truly dedicated attorney who acts within the law, behaves ethically in all matters, and who will sacrifice himself for his brothers, as he has done here. I have never had, nor do I have now, any doubts about his honesty or integrity." (Ex. M-5).

***Class Members***. Lerach's clients—the class members that he has represented—have expressed their appreciation for his years of work on their behalf. Many of those who wrote in support of Lerach were victims of the Enron fraud.

"The only help we received in trying to recoup our savings was from Wm. Lerach and Company . . . .  Were it not for Mr. Lerach coming to our rescue, we would not have the hope of recouping some of our losses . . . .  Mr. Lerach meant a lot to us as our only hope . . . ."  *John and Charlotte Cassidy, who lost thousands of dollars from their retirement savings* (Ex. C-7).

"This is a man of great compassion, a man of honest concern, a man who deserves that his many good deeds be considered . . . .  I have seen this man work tirelessly for years with an energy and intensity that can only be described as a force of nature.  Yet . . . he still took the time to personally explain aspects of the case, inquire into our financial situation, and have us out for lunch.  None of these benefited him financially, but it did demonstrate to me why he is so driven and it is not by money.  He cares; he honestly wants to help."  *Mervin Schwartz, a 68 year-old retired mechanic, who lost over $123,000 of his retirement savings* (Ex. S-6).

"Mr. Lerach's personal involvement and actions have been instrumental in obtaining substantial settlements, which will be of major benefit, especially to those who were stripped of their retirement savings.  Without Mr. Lerach's knowledge and ability, these recoveries may have never been possible."  *Stephen and Alice Smith, class representatives* (Ex. S-8).

Nogah Bethlamy, a veteran of World War II and the Korean War, and his wife lost over $100,000 in a ponzi scheme targeted at elderly investors.  Bethlamy writes:

"I sought the assistance of . . . Bill Lerach to try to help my wife and me and other investors collect the lost funds that I knew would never be recovered in bankruptcy court . . . .

"There were heartbreaking stories like those of a couple who had invested their life savings . . . so that the monthly income stream could be used after their death to pay for the care of their only child who was institutionalized with severe cerebral palsy.  Mr. Lerach and his partners who worked on this case were aware of the plight of investors like these and devoted thousands of hours to prosecuting the case.

"When it turned out that all the major perpetrators of the scheme but one would never be able to pay a judgement against them, Bill Lerach and his team did not abandon the case and ultimately negotiated a settlement with the one defendant able to pay.  With Bill Lerach's authorization, the firm agreed to waive its fees for thousands of hours of legal work . . . so that the entire settlement could be distributed to all the class members.

". . . I do not think that there are many firms that would have done what Mr. Lerach's firm did for us in continuing the case on our behalf when they knew there was little chance of being reimbursed for their legal work.  My wife and I and the investors with whom I spoke were

8

all very grateful that we had such a firm working for our interests." (Ex. B-7).

Lerach's clients have also written of how his work instilled in them greater faith in the legal system. ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████

***Professional Colleagues.***  Ben Stein, the noted lawyer, economist, and commentator writes:

> "It was my great good fortune to meet Bill Lerach in about 1986 when I was writing for Barron's.  He was a truly amazing source of information and insight about how financial frauds and breaches of fiduciary duty worked.  He explained to me how even the most complex frauds worked, and I used that insight to write about many frauds and stop a number of fraudulent deals by my writing.  It would not be an exaggeration to say that I learned more about law from Bill Lerach than I learned in my three years at Yale Law School.  I especially learned from him what a sense of fairness in financial dealings meant."  (Ex. S-14).

Stein continues: "I believe that Bill, by himself, was about as useful as the entire SEC in fighting and deterring financial fraud for most of the years I have known him.  He was the single largest deterrent to fraud . . . ."  *Id.*

Ralph Nader, the renowned consumer advocate, writes:

> "I have known William Lerach for over twenty years.  While we are not close friends . . . I believe that his contribution to society, and in particular to shareholders is singularly significant.  I also believe that the suits he has filed have improved the market place and have improved corporate governance in the United States . . . .  Until now, I have not written a letter asking a judge to be lenient in sentencing a defendant.  I do so today because of the unique contribution William

9

Lerach has made to our society and to the practice of law. . . ." (Ex. N-1).

United States Senator Carl Levin of Michigan, who has known Lerach for many years, writes:

> "I have found him to be a person of ability and integrity who has worked diligently to represent his clients.  In addition to his commitment to the legal profession, Mr. Lerach has been deeply and generously involved in efforts to make his community and his country a better place to live and work." (Ex. L-8)

G. Paul Howes, who ran the Houston office of the Lerach Coughlin law firm during the Enron litigation, "saw firsthand Bill's commitment to shareholder justice and restitution."  (Ex. H-7).  Howes writes:

> "Beyond his involvement in every aspect of the legal procedures, he was dedicated to holding the world's largest financial institutions accountable for their role wiping out the retirements of hundreds of thousands of shareholders . . . .  His was the eloquent voice that explained this complex case to the media and diverse sophisticated audiences . . . ." *Id.*

But Howes also saw Lerach "take equal time to explain the fraud in simple terms to unsophisticated investors." *Id.*

> "I witnessed his one-on-one and small-group sessions to explain . . . our strategy and to assure victims that he would fight for them. Because I worked closely for five years with some 40 Enron class representatives and shareholder victims, I know better than anyone how much they value this personal approach and how much it meant that he would take time to make sure that they understood the case and our firm's commitment to doing justice for them . . . .  I watched him educate and comfort, as though they were family, two 30+-year Enron linemen who each lost their entire retirement accounts. . . . [T]hose few minutes, which made an indelible impression on them, demonstrates Bill's character, his common touch, and how he values working folks . . . ." *Id.*

Howes describes Lerach as "a brilliant lawyer, a champion of working-class Americans, a dedicated father and husband, his word and handshake are good enough to seal any deal, and . . . someone I would trust with my wallet and dogs and would want with me in any battle . . . ." *Id.*

Mitchell Gravo, an attorney who has worked with Lerach for the last six years, echoes the theme of Lerach's respect for people from all walks of life:

10

410707.01

1    "Notwithstanding his talents and stature, I have witnessed Bill's
2    interaction with ordinary people like assistant attorney generals, labor
     and management trustees, secretaries, people that cater parties at my
3    house; in short all types of regular people.  I have never seen Bill fail
     to be polite and respectful to these people.  I have, however, seen
4    other people who were much less accomplished than Bill treat such
     people terribly.  I am a firm believer in judging a person's character
5    by how he or she treats those of less stature.  Based on this standard,
     no one that I know has better character than Bill.  (Ex. G-10).

6    *Adversaries*.  Lerach spent his professional life prosecuting high-profile,

7    contentious big-stakes litigation, adversarial contests of the highest order.  Yet,

8    those who opposed him have high praise for his professionalism, civility and

9    trustworthiness.  Here is what some of his opposing counsel have had to say about

10   Lerach.

11   "I am in the unusual position of writing to support a man, Bill Lerach,
     who was my primary adversary in over thirty years of securities class
12   action litigation . . . .  Bill was, without question, the smartest, most
     creative, most tenacious plaintiff's lawyer I ever faced.  He was
13   enormously effective for his clients . . . .  [T]here is no question that
     Bill's efforts, and the results he achieved, forever altered the securities
14   litigation landscape and profoundly affected how public companies
     conduct themselves and communicate with their shareholders and the
15   public markets . . . .  I also found Bill—despite the fact that he was my
     adversary—to be a person of the highest integrity . . . .  His honor was
16   as great as the ferocity with which he pursued his cases."  *Tower C.*
     *Snow, Jr.* (Ex. S-9)
17
     "I have never met a more ferocious, or more passionate, adversary
18   that Bill Lerach.  Bill has fought for his client's rights and interests
     with a zeal that is unmatched in my professional experience . . . .  Less
19   well known is what I would refer to as Bill's 'character' as an
     adversary . . . .  Bill has been a trustworthy, principled and honorable
20   adversary in every respect . . . .  [H]e has been a man of his word and
     a person of integrity.  Bill has delivered unfailingly on each of his
21   promises—large and small.  In our many professional encounters, Bill
     never cut a single corner; he never spun or twisted a single statement
22   . . . .  When he makes a promise, you can take it to the bank . . . .  I
     very much enjoyed my professional experiences with Bill, as grueling
23   as they were at times.  And I have grown to respect Bill enormously"
     *Brad S. Karp* (Ex. K-2).
24
     "[T]his Court deserves an honest and direct expression of an
25   adversary's view of Mr. Lerach's character in the conduct of his trade
     . . . .  Mr. Lerach has never authored a 'strike suit' that I have been
26   asked to defend.  In each and every case I can genuinely state that the
     questions embedded in the claims of Mr. Lerach's complaints were
27   fair questions to ask, were fair questions to be adjudicated and were
     questions fairly prosecuted . . . .  Without exception that I can recall
28   did Mr. Lerach fail to advocate with both zeal and excellence on

                                      11

behalf of his clients.  If these cases were borne of corrupt intent, as indicated in the public statements about his indictment, there was never a scent of corruption, fraud or abuse in their prosecution.  I have known Mr. Lerach to be a tough, persistent and skilled advocate on behalf of his clients—but he always acted within the bounds of both ethics and professional propriety . . . .  [W]e, and the bar, have lost a magnificent adversary." *Ralph C. Ferrara* (Ex. F-2).

". . . I have defended my clients in securities suits brought by Bill Lerach and his law firm.  The accusations were always unpleasant, and the cases were intense.  But there was never personal acrimony . . . or unprofessional conduct . . . .  [H]e was always prepared, professional, courteous and practical.  His representations to me were accurate.  He always kept his word and honored his stipulations without the need of signed stipulations . . . .  [O]ur professional relationship was one of mutual respect and courtesy . . . .  [H]e always conducted himself with integrity within the statutory rules, and professional rules.  He earned my professional respect." *Robert Steiner* (Ex. S-15).

"In my experience and in the experience of ***all*** of my defense lawyer colleagues, Bill Lerach is and was at all times an honest lawyer.  Our clients and many of my colleagues often were angry or upset at the fact that they were in litigation initiated by Bill . . . .  But no one ever expressed even a hint of the view that Bill was not completely honest in what he represented to us and to the Court.  Bill was a straight shooter at all times.  You could trust what he said at all times.  I have little doubt that the billions of dollars recouped for shareholders by Bill and his firm ***never*** would have been recovered had it not been for Bill . . . .  I cannot think of a lawyer who has made a greater contribution to the lives of ordinary people (and on a more sweeping scale) than Bill Lerach.  Nor can I think of an attorney who is more honest, more ethical, and more professional . . . ." *Dan Lawton* (Ex. L-1).

"I have litigated many cases against Mr. Lerach over the years.  I always found Mr. Lerach to be an honorable and upright opponent.  His oral word was as good as his written . . . .  Mr. Lerach and his firm were professional and honest . . . .  Mr. Lerach has represented the interests of many individuals of modest means, and he has been zealous in his efforts to protect their interests . . . .  In my 52 years of practice, I have never written a letter of this type to a Court.  I am making an exception in this case because I hold Mr. Lerach in the highest regard." *Jerold S. Solovy* (Ex. S-12).

***Young Lawyers***.  The letters of support also reflect the impact Lerach has had on so many young lawyers, mentoring and inspiring them to fight hard for victims while approaching their cases with care, caution, and objectivity.

"He acted as a mentor to me and to many other young lawyers . . . .  He always had words of encouragement and praise for me when I worked hard [or] performed well . . . .  He was a charismatic figure who was approachable and sympathetic to many in our field who

12

410707.01

would come to him for advice or friendship.  He was always promoting other lawyers to prominence and sharing his glory or other privileged positions with others he respected . . . .  [When] Bill and I met . . . I was a new wife, a new mother, and a relatively new lawyer feeling my way . . . .  Even though Bill was older and more experienced than I was, he treated me as a complete co-equal and empowered me as a lawyer and as a person . . . .  Unlike many extremely successful lawyers, he did not hog the limelight, but instead, shared it and encouraged younger lawyers like myself to advance in the profession."  *Sherrie Savett* (Ex. S-3).

"Bill . . . expressed how important it is to have conviction, even when challenged by those more powerful and experienced than yourself.  I was barely 21 years old at this time and Bill's lesson to me came at a pivotal time in my life.   He taught me it is better to persevere with what you believe to be right than to be stymied by worrying about being wrong."  *Brian J. Robbins* (Ex. R-5).

"I am deeply appreciative of the friendship and respect Bill has given me over the years.  When I first stated working with him, I was only a few years out of law school . . . I had never been in a courtroom, nor had I ever represented a client.  None of that seemed to matter to Bill.  From day one, he solicited my input on strategy and tactics."  *Pamela Gilbert* (Ex. G-6).

"[A]s driven as he is and as much as he cares, he did not push me to do anything that I thought was wrong.  If I disagreed with him on an allegation in a complaint, he would simply say take it out."  *David C. Walton* (Ex. W-2).

**Friends.**  Two extraordinary letters from Lerach's friends describe his loyalty, kindness, and generosity.



SENTENCING MEMORANDUM OF WILLIAM S. LERACH
CASE NO. CR 07-00964-JFW

410707.01

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



18   ***Educators***.  Lerach has been praised by academics and lawyers involved in

19   continuing education for his contributions to the advancement of the legal

20   profession and the public's understanding of investor and consumer rights.

21   "I know Bill Lerach as an extraordinary, passionate, engaging teacher.
     He knows more about the law and corporations than most professors
22   or CEOs.  Few are as clear and as enlightening about the intersection
     between the competitive dictates of the market and the social
23   mandates of the law. . . .  [W]e spoke together in front of a group of
     workers reeling from plant closings in Cincinnati, Ohio.  He captured
24   their rapt attention as he explained not only the dynamics that were
     sweeping the economy, but also how that impacted on their
25   companies.  He had done his homework about their specific situation.
     He answered their questions with respect and without condescension.
26   He was funny and stunningly insightful . . . .  For me, he has been
     generous with his time, his learning, his insight and his resources.  He
27   has contributed to our Institute, helping to build our educational
     efforts, but many do that.  Bill has been unique in contributing not
28   simply financially but of his own time and energy to help engage

14

SENTENCING MEMORANDUM OF WILLIAM S. LERACH
CASE NO. CR 07-00964-JFW

citizens in understanding the world around them." *Robert Borosage, President, Institute for America's Future* (Ex. B-10).

"Bill has tirelessly sought to promote a better understanding of investor and consumer rights in business and legal communities and even in the public at large, by authoring articles, opinion and commentary pieces, and by giving of his expertise and time to make presentations at continuing education programs, conferences, etc. around the country . . . .  Bill has been a guest lecturer in my Corporations course, readily agreeing to give presentations . . . to overflowing classrooms of enthusiastic students.  He always receives rave reviews . . . .  He is a most gifted and effective classroom teacher, and my academic colleagues and I at the University of San Diego look forward to his continuing to share his skills, knowledge and experience with our law students." *C. Hugh Friedman, Professor of Law at the University of San Diego* (Ex. F-7).

"From 1995 to 1997, I served as an Adjunct Professor of Business Law at the University of San Diego School of Business, teaching Business Law I and Business Law II.  Notwithstanding his many time commitments, Mr. Lerach generously donated his time as a guest lecturer in my classes on several occasions during the time I taught at USD.  Bill was always passionate about learning and helping young students . . . .  Mr. Lerach has also made a significant contribution to scholarship and the legal community, having written numerous scholarly articles about securities litigation." *Francis Bottini, Jr., former Adjunct Professor of Business Law at University of San Diego* (Ex. B-11)

Lerach's contributions to legal education have been noted in particular by the University of Pittsburgh, his alma mater.  Professor David J. Herring, former Dean of the University of Pittsburgh School of Law, writes:

"Bill was, by far, the most outstanding graduation speaker during my years as dean . . . .  He also modeled the passion that young lawyers need . . . to succeed not only as legal professionals, but also as active citizens . . . .  To this day, I have graduates from the class to whom he spoke approach me and thank me for having Bill Lerach deliver their graduation address.

"[S]everal of the School's graduates owe their legal education to Bill.  He has established an endowment fund that provides financial scholarships to students in need.  These scholarships have allowed student recipients to attend law school.  The scholarships have also allowed recipients to reduce their student debt, freeing them to pursue the legal careers of their choice, including public interest positions that they could not otherwise pursue . . . .  Bill is a rare and special person for giving so much to the School of Law."  (Ex. H-3).

Mark Nordenberg, who is now Chancellor of the University of Pittsburgh and who previously served as Dean of the University's School of Law, writes:

15

410707.01

"Without a solicitation from me, Bill offered to create a scholarship fund at Pitt.  In doing so, he clearly was driven by a belief in the power of higher education, as evidenced in his own life.  He chose to name his fund 'The Lerach Family Scholarship Fund,' so that it also would reflect the links that existed between his father and his brother and this University."(Ex. N-5).

**_Employees and Staff_**.  Lerach has also mentored and supported the personal development of countless employees and staff of the Lerach Coughlin law firm.



SENTENCING MEMORANDUM OF WILLIAM S. LERACH
CASE NO. CR 07-00964-JFW

410707.01



Kathleen Strozza, who has worked with Lerach for 30 years, describes

> "a man who because of his kindness, generosity and fairness had over
> 100 employees (non attorneys) with him more than 10 years (and half
> of those more than 20 years) in an era where the average employee
> stays with a company less than 5 years . . . . [a] man who during a
> deposition break got up and got defense counsel a cup of coffee when
> the defense counsel asked the only woman in the room to get it for
> him . . . . [and a] man who allows children of all ages, on any given
> day of the week, in the workplace because he understands the
> difficulty single mothers have with daycare."  (Ex. S-18).

Hector Millan, a paralegal at Lerach Coughlin, met Lerach in 1982 after

Lerach gave him his first job after high school at the age of seventeen.  Millan

writes:

> "My very first job was in the copy room.  I remember initially being
> very nervous as this was my first 'important' job, but Bill made me
> feel at ease.  Bill always had a huge smile for me and always asked
> how I was doing.  He was always genuinely concerned for me and
> made sure that I was happy in my new position.  That, of course, has
> never changed throughout the years.  He always has a kind word for
> me, always asks for my parents, and always asks me 'if I am keeping
> busy' and whether I am happy."  (Ex. M-8)

Lerach's generosity and concern for the people who work around him do not

end when times turn difficult.



17

410707.01



Lerach's caring and generosity extend beyond the walls of the law firm that bore his name.  Lerach's personal driver Frank Cucinotta, writes:

> "I want to say that in my personal relationship with Bill, he has always been extremely kind, generous and courteous to me.  I have been a driver for many years . . . and I can tell you that most people are not that way.  He has never been angry, critical or demeaning in any way to me.  Bill has been extremely generous to me.  When I needed a loan to help buy a home for my family, he loaned me a considerable amount of money without charging me any interest and allowing me not to repay the loan until I sold the home.  This meant a tremendous amount to me and my family, as we were able to live not only in a better neighborhood, but assisted in my being able to send my daughter to private Catholic school which was very important to my wife and to me . . . .  Other people don't treat people who work for them this way.  It may sound corny, but to put it simply—he is the nicest guy I have ever known."  (Ex. C-17).

***Family***.    Lerach's family from Pittsburgh portray a loyal, generous, and loving man who has never forgotten who he is or where he came from.



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19



20   Lerach now lives with his wife Michelle Ciccarelli Lerach, his daughter

21   Shannon, who is studying for her Ph.D. in Abnormal Psychology, and his in-laws.

22

23

24

25

26

27

28



19

410707.01

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



410707.01



[redacted]

[redacted]

[redacted]

## IV. LERACH'S CONTINUING VALUE TO HIS COMMUNITY

Lerach remains a valuable asset to his community. He will continue to serve as a lecturer and teacher in his areas of unquestioned expertise, now uniquely supplemented by his personal tragic example of the consequences of excessive zeal and ambition. His colleagues in the academic community look forward to his return to teaching.

Most significantly, the University of Pittsburgh School of Law has asked Lerach join their educational program as soon as he is released from incarceration,

even if he is then in home confinement, to begin as early as January 2009.  As detailed in the letter of Dean Mary Crossley, Lerach (without compensation or expense reimbursement) would participate in teaching ethics, civil procedure, corporations, securities and remedies and act as an advisor in connection with the school's Moot Court program.  *See* Ex. C-16.  Dean Crossley writes:

> "I am writing with an educational proposal involving William S. Lerach that I hope you will consider as you deliberate his sentence.

> "Mr. Lerach is an alumnus of our Law School who in the past has been generous with his time with our students, proving to be an effective classroom teacher.

> "Despite his serious transgressions—indeed, at least in part because of them—I believe he could productively spend his time and talents teaching our students about the need always to practice ethically and within the strictures of the law, the pitfalls attorneys face when they breach high ethical standards, and the steps they might take to avoid his fate.  Members of our legal ethics faculty view the proposed involvement of Mr. Lerach as offering a unique and powerful educational opportunity for our students.

> "Moreover, as many leading legal education experts have concluded, the teaching of ethics is most salient when the topic is the overlay of other legal topics, and so Mr. Lerach's classroom presence would include leading discussions not only of legal ethics and professional responsibilities, but also how those issues come into play with substantive and procedural areas of the law such as civil procedure, securities law, and corporation law.  Given Mr. Lerach's extensive experience as a litigator, he would be able to offer students valuable real world illustrations of how major litigations are conceived and contested and the interplay of substantive law with procedural rules.  He could also advise our students who are engaged in moot court activities on written and oral advocacy.  Members of the Law School's faculty would be involved in all of Mr. Lerach's lecturing and would help ensure the integration of serious reflection on ethics and professional responsibility.

> "From the School's perspective, this programming would work best if Mr. Lerach were on campus for 10-day blocks of time once a month to lecture in courses taught by faculty members, but we could consider other schedules as well.  We are prepared to begin this program during the semester that will commence in January 2009, if that would be possible and consistent with any sentence you might impose (perhaps even in conjunction with any period of home confinement that might be imposed by the Court).  If beginning in January 2009, Mr. Lerach's service would continue for four academic semesters.  Mr. Lerach would not receive any compensation or expense reimbursement for his work or travel to Pittsburgh. I believe such an arrangement would benefit University students with a powerful object lesson and could be a meaningful part of Mr. Lerach's re-commitment

to every standard of the legal profession the School of Law is committed to uphold." *Id.*

Other legal scholars and lawyers have also recognized that Lerach has much to offer and have urged the Court to incorporate into Lerach's sentence a component of community service to be performed by teaching and lecturing:

> "Lerach can offer much in present and future community service. Many persons sentenced for financial crimes have been offered that opportunity in full or partial remission of their crimes . . . . I am confident, based on my knowledge of his character and his personality, that Lerach would provide significant public benefit if that obligation were one of the elements of his sentence." *Richard Buxbaum, Professor of Law at University of California, Berkeley School of Law* (Ex. B-15).

> "He has so much to contribute and we will all be diminished by his incarceration. I respectfully urge your most serious consideration of a minimum sentence in prison and punish him by putting to good use his tremendous intellect, talent and heart." *Lynn Schenk, lawyer and corporate director* (Ex. S-4).

> "I believe Bill has a truly outstanding and unsurpassed command of this area of law, and I urge the Court to draft a sentence for his crimes which will permit and encourage Bill to continue to speak out on legal ethics and educate prospective attorneys in the area of securities law." *James Krause, lawyer and law professor* (Ex. K-7).

> "I would suggest utilizing Mr. Lerach's intellect and persuasive skills by having him work without pay with a law school or nonprofit organization to expand the legal and ethical framework that shapes the practice of law and corporate governance in the United States . . . . Mr. Lerach might even be required to spend a year visiting law schools and lecturing law students on the importance of avoiding unethical or illegal acts as an attorney." *Ralph Nader, consumer advocate* (Ex. N-1)

> "I am hopeful that some good may come from this unfortunate situation. I believe that Bill would have much to offer to law school students who are learning how to represent clients and fight for justice. I am lucky to have had the chance to learn from him at an early stage of my career, and I think others would benefit from that same opportunity. I believe our society would be better off if Bill was permitted to serve some of his sentence doing community service in a law school clinic, helping to teach students how to successfully represent the underrepresented against great odds and powerful foes, as he has done throughout his career." *Pamela Gilbert, lawyer* (Ex. G-6).

410707.01

As the Presentence Report notes, Lerach's respect for the law remains intact. So does his love of the law.  Even since his guilty plea in October 2007, he has lectured to classes at the University of San Diego Law School.

> "I . . . invited [Bill] to teach the final class and cover the entire area of Rule 10b-5 law . . . .  [H]e started his lecture with a discussion of ethical pressures that all lawyers face (to their clients, their firms and the courts).  He admitted that he had committed a crime and would pay a severe price, including a loss of his liberty, for having done so. He then proceeded to review all of the major issues in a 10b-5 case. His presentation was extremely thorough.  The class was amazed at his knowledge of all aspects of the law.  I truly believe Bill's presentation to my securities law class will be an experience the students will never forget." *James C. Krause, Adjunct Professor of Law* (Ex. K-7).

Lerach has also recently authored opinion pieces published in the *Washington Post*, *San Francisco Chronicle*, *Houston Chronicle*, *San Diego Union-Tribune* and *Pittsburgh Post-Gazette/Sun Telegraph*.  As colleague Dan Newman writes,

> "He has become more focused than ever on fighting to protect ordinary people from powerful interests . . . .  [T]he result has been that he is more dedicated than ever to putting his insights, experience and skills to good use.  For instance . . . Bill has published commentary articles in the nation's most widely-read newspapers . . . . Bill wrote those articles not for personal benefit or financial gain—he wrote them because he was outraged by what he saw happening.  Bill is the rare person with both uncanny insight and understanding of complex financial concepts, combined with the ability to explain in simple terms how Wall Street affects Main Street—and he wanted to use his skills to benefit the people being hurt in the subprime debacle."  (Ex. N-2)

## V.    THE EXTRAORDINARY LIFE OF WILLIAM LERACH

### A.    Pittsburgh

Bill was born in March 1946 in Pittsburgh, Pennsylvania.  The product of a middle class family, he attended public schools, the University of Pittsburgh and the University of Pittsburgh School of Law.  Bill's father died suddenly in 1963 when Bill was in high school.

24

███████████████████████████████████████████

██████████████████████████████████████  Michael W.

Bradshaw writes that Lerach's "childhood was difficult and his father passed away

when he was a freshman in high school.  Bill's father had lost an inheritance

during the depression and struggled financially until his death.  Bill overcame

hardships through perseverance and innate talent."  (Ex. B-13).

During college and law school, Lerach lived with his widowed mother, to

whom he remained devoted until she died in her 80's in the 1990s.  Darlene

Campeau, a family friend who has known Lerach since he was a freshman at the

University of Pittsburgh, lovingly describes Lerach's relationship with his mother.

> "While he was both an undergrad and law school student Bill shared
> an apartment with his mother while I shared with his mother the
> Development Office at the Pennsylvania School for Blind Children.
> Ev Lerach (Ev) and I became dear and lifelong friends resulting in
> daily discussions, wonderful stories of Bill's childhood, how he did on
> his last test, his leadership roles in the community and then updates
> throughout his academic, social, and later, his family and professional
> life.  Bill and Ev had a close relationship, one built on tremendous
> caring, respect, pride, warm laughter, joy and love . . . .

> "I remember vividly his Mom's pride when Bill won his first high-
> profile case.  She asked me to watch a television program because Bill
> was interviewed, having won a case on behalf of elderly victims of
> financial fraud.  "My Bill is something else—because he so deeply
> cares for the disadvantaged . . . ."

> "I remember poignantly visiting Ev, at the nursing home in her last
> years.  With great joy she recalled her cross-country trip with Bill
> when he moved from Pittsburgh to the West Coast.  She proudly told
> me how brilliant he was.   The trip was filled with his entertaining
> quips—using his extensive knowledge of geography, topography and
> American culture and history.  I also witnessed personally Bill's daily
> phone calls and/or fax to her.  The fax always started out with 'To the
> World's Greatest Mom.'"  (Ex. C-1).

Lerach's undergraduate and legal education were largely financed through

academic, merit-based scholarships and working part-time throughout his years as

a student.  He worked as a laborer at a nursery, as a "gofer" at a funeral home, and

as a credit reporter at Dunn & Bradstreet, among other jobs.  Lerach became an

25

outstanding law student, graduating second in his class and being named to Order of the Coif.

After graduating from law school in 1970, Lerach went to work at the venerable Pittsburgh law firm Reed, Smith, Shaw and McClay, representing some of the largest corporations and financial institutions in the country.  After five years, Lerach was elected partner.  He was the youngest partner ever at the firm and had achieved partnership in the shortest period of time in the firm's history.

## B.    California

In the course of Lerach's practice at Reed Smith, he met Mel Weiss of the Milberg Weiss law firm and agreed in early 1976 to Weiss's request that he join Milberg Weiss.  After Lerach accepted that offer, he moved to California in March 1976 and opened the west coast office of Milberg Weiss in San Diego—one person, in one room with a part-time secretary.  Milberg Weiss was already a well-established, successful New York City firm specializing in shareholder lawsuits. The firm had an existing network of referring lawyers and brokers and clients who were willing to serve as class representatives in suits.  The firm was run by Larry Milberg, Mel Weiss and David Bershad.  Milberg was the founder.  Weiss was the driving force.  Bershad managed the firm and its finances in the New York headquarters office.

While the West Coast branch of Milberg Weiss started with just one lawyer, under Lerach's leadership it eventually grew to over 150 lawyers, with more than 350 total employees, handling large complex securities cases all over the United States.  The enactment of the PSLRA in 1995 dramatically changed the securities class action practice, especially the identities of the class or lead plaintiffs.  Lerach quickly led his firm into representing the large institutional investors, who filed most securities cases after the PSLRA.  "Professional" individual plaintiffs disappeared.  In 2004, Bill and his west coast partners left Milberg Weiss, and the firm split into two separate firms, one headquartered on the east coast and one

26

headquartered on the west coast.  Bill assumed the role of Chairman at the new west coast firm, named Lerach Coughlin Stoia Geller Rudman & Robbins.  In that new firm, Bill continued to litigate the same type of high-profile shareholder suits throughout the United States, almost always led by institutional investors.

From 1976 through 2007, Bill dedicated his energies, skills and resources towards representing the interests of investors and consumers who had been abused by corporations, banks, accounting firms and insurance companies.  Many of the letters to the Court stress that Bill was a skillful, innovative and, most of all, dedicated advocate, leading his firms into battles against larger, better-funded adversaries, achieving remarkable successes for his investor and consumer clients.

### C.     The *United Methodist Church* Case

One of Lerach's first high profile cases was the *United Methodist Church* case, which arose out of the collapse of "lifetime care" retirement communities named Pacific Homes, which were "sponsored" by the Methodist Church.  *See Barr v. United Methodist Church*, 90 Cal. App. 3d 259 (1979).  The 2,000+ elderly residents of Pacific Homes had made large up-front payments (often their life savings) in exchange for lifetime housing, food, and medical/nursing home care.  When Pacific Homes filed for bankruptcy, these elderly residents faced a horrible crisis.  They were threatened with the loss of their homes when they had few funds to provide for themselves.  The litigation led by Bill yielded a large recovery (over $40 million), the proceeds of which recapitalized Pacific Homes, allowing it to continue serving its residents.  The settlement also provided for damage reimbursement to the victims in the future—some $40 million they or their heirs later shared—with no fee taken on this portion of the recovery.  The case was featured on "60 Minutes," and involved a four-month trial and three trips to the U.S. Supreme Court.  As is true of all of Bill's work since 1976, it was funded by his firm, which took it on a contingency fee basis while advancing millions of dollars in costs to assure vigorous representation of his clients' interests.

Lerach's skill and dedication in achieving this outstanding result are attested to by the appellate judge who wrote the landmark *Barr* opinion.  Judge Howard Wiener writes:

> "I remember the young, curly-headed chap who argued for the plaintiffs, elderly victims in an alleged financial fraud, in *Barr* . . . .  I recall with clarity the forceful brief he submitted and the emotion, eloquence and persuasiveness of his oral argument.  A unanimous opinion reversed the trial court's dismissal of the action explaining there were no constitutional impediments prohibiting the church from being sued.  The case was later settled allowing over 1900 plaintiffs, residents of the subject retirement homes, to continue to live in their apartments in a manner they could afford.  It was a dramatic and successful conclusion to a legally challenging and emotionally wrenching case, particularly for the hundreds of persons who would have been dispossessed but for Bill's dedicated efforts."  (Ex. W-6).

Others who worked on the *United Methodist Church* case echo Judge Wiener's praise.  James Granby, the lawyer who brought the case to Lerach, writes:

> "It was only Bill's commitment to protect these people, and his championing of their cause with his New York partners, that ultimately gave the residents any hope at all . . . .  Bill and his firm did not need the case, but they did it—Bill did it, because it needed to be done.  I saw his warmth and his concern in his interactions with the residents, who were in the courtroom every day.  He was, indeed, a hero.  He served those who had no friends, and no resources to protect themselves, and in so doing, he served in the highest traditions of the bar."  (Ex. G-9).

Kathleen Strozza, a staff member who worked on the case, lauds Lerach as "[a] man who fought for hundreds of elderly in protecting the investment of their life savings against the United Methodist Church."  (Ex. S-18).  Strozza writes:

> "Unfortunately these individuals are now deceased.  However . . . I can say that you would be receiving hundreds of letters from them praising Bill if they were alive . . . .  A man who held the hand of a resident . . . who was dying of cancer, consoling him, reassuring him that his wife would be taken care of and secure."  (Ex. S-18).

## D.     Pre-PSLRA Securities Cases

In the 1980s and 1990s, stock trading volumes, stock offerings, and mergers and acquisitions soared.  As corporate insiders, venture capitalists, and Wall Street bankers increasingly took advantage of investors, Lerach focused more and more

28

on situations where public companies had misinformed, or concealed material information from, the investing public—often while corporate executives and directors traded on inside information.  Many of these suits broke new legal ground and involved innovative legal theories.  All were factually complex and faced serious procedural obstacles.  All were defended by the best legal talent available—funded by large insurance companies or inexhaustible corporate tills.  Yet, Lerach consistently achieved large financial recoveries for victimized investors.  A few of these pre-1995 securities cases deserve mention:

*Lincoln Savings/American Continental Corp.*  Lerach led the suits against Charles Keating and his complicit lawyers, accountants, advisors and bankers who had cheated more than 20,000 retired persons out of millions of dollars, often the victims' life savings.  The $250 million recovery—one of the largest in history up to then—represented a substantial portion of the victims' losses.

*Drexel/Milken Litigations*.  Lerach led a series of suits against Drexel Burnham Lambert, related savings and loans, Michael Milken and others that resulted in exposure of the fraudulent Drexel "Daisy Chain," stimulated governmental enforcement proceedings, and produced recoveries for defrauded investors and abused corporations of over $1 billion.

**E.     The PSLRA—Representing Pension Funds**

In connection with the passage in 1995 of the PSLRA, Congress held hearings with testimony regarding the well-known phenomenon of repeat plaintiffs and the payment of referral fees.  The PSLRA, for the first time ever, legislatively addressed the issue of repeat plaintiffs and extra compensation to class representatives in lawsuits filed after its effective date in December 1995.  In the

29

410707.01

years following passage of the PSLRA, the practices in the securities class action bar changed substantially and Lerach's practice changed dramatically.  The 1995 Act changed the method for selecting lead counsel in securities class actions.  The "first to file" rule was gone.  Instead, lead counsel status was awarded to the law firm whose client had the largest stake in the outcome of the litigation.  These reforms were designed to induce public and Taft-Hartley pension funds to prosecute these class action cases as lead plaintiffs, largely eliminating the role of small individual investors, many of whom had been "professional plaintiffs" in bringing these cases in prior years.  While pre-PSLRA cases continued to be litigated, and some referral fees were paid in connection with those "pre-Act" cases, any practice of compensating class plaintiffs in post-PSLRA cases in which Mr. Lerach was personally involved ended.

By switching the emphasis from small individual investors to institutional investors, the 1995 PSLRA dramatically altered the legal landscape.  After 1995, under Bill's leadership, his firm actively reached out to the pension fund community and in a relatively short period of time became the premier firm representing public and private pension funds in securities litigation in this new era.  Among the public pension funds Bill represented in the post-PSLRA era are CalPERS, CalSTRS, The Regents of the University of California, LACERA, and numerous other California City and County pension plans, the State of Washington, several Ohio public pension plans, Illinois public pension plans, the Tennessee public pension plan, and the Maine Retirement System.  In addition, during the same time period, Bill represented many Taft-Hartley pension plans including large Teamster pension plans, SEIU pension plans, UNITE-HERE and Painters pension plans, as well as Amalgamated Bank's LongView Investment Fund, the largest union-owned fund in the United States.  *See* Letter from Byron Georgiou (Ex. G-4).   There has been no suggestion of any impropriety whatsoever in Lerach's relationships with these institutional investor clients which he has

1   represented in securities lawsuits over the past 12 years.  Letters from Bradley

2   Raymond, the Teamsters' General Counsel (Ex. R-2),[6] Ronald Luraschi, a former

3   Amalgamated Bank official (Ex. L-13),[7] and Mark Brossman, a pension fund

4   lawyer (Ex. B-14) attest to Lerach's work in this regard.[8]

5         Peter Mixon, General Counsel of CalPERS, the largest public pension fund

6   in the United States, provides particularly instructive background on Lerach's work

7   on behalf of major institutional investors:

8         "CalPERS is, and has been, a long-term institutional investor in
    publicly-traded domestic securities.  As of October of last year, the

9   domestic equity and bond portfolios of CalPERS totaled
    approximately $140 billion.  As a result of its holdings, CalPERS was

10  hit hard by the accounting frauds perpetrated at Enron, Worldcom,
    and other companies.  Over the past seven years, Mr. Lerach and his

11  former firm represented CalPERS as plaintiff in several securities
    fraud actions.  I take a fairly active role in these cases and I have come

12  to know Mr. Lerach during this time.

13  _____

[6]       "Mr. Lerach and his firm have represented the IBT, and many of its

14  affiliated benefit funds, in various matters over the past five or so years.  The
    matters on which he has consulted with or represented the Union and/or its funds

15  generally involved circumstances in which the Union or its funds were  the victims
    of financial fraud, including violations of state or federal securities laws.  During

16  the time we have worked with Bill, he has matched his passionate advocacy with
    high ethical standards.  His track record of advocating on behalf of victims of

17  financial fraud is unparalleled." *Bradley Raymond* (Ex. R-2).

18  [7]       ". . . I worked in the Trust & Investment Services Department, which was
    largely responsible for managing the employee benefit plan assets of union pension

19  plans, in many cases the sole retirement benefit for workers and their families.  The
    Bank took its responsibility for managing these assets very seriously and actively .

20  . . participate[d] in securities class action lawsuits. . . .  The Bank worked with a
    number of law firms in this regard while I was at the bank but you should know

21  that Bill's experience, professionalism and desire to achieve a fair [and] favorable
    result for the benefit of the Bank's clients was often times unmatched. . . .  Bill is

22  an extraordinary individual, with high moral character . . . . an honorable and
    decent person.  In my view, he always worked extremely hard for the Bank, its

23  clients and for the direct benefit of working families." *Ronald Luraschi* (Ex. L-
    13).

24  [8]       "As part of my professional expertise, I am counsel to institutional investors

25  including the Boards of Trustees of many labor-management pension and health
    funds.  In this capacity, I have had the opportunity to interface directly with Bill

26  Lerach on several important cases.  I admire Bill's lawyering skills.  He is a
    lawyer's lawyer.  He works extremely hard; has a firm grasp of the facts and the

27  law in all of the cases in which he is involved; and has extraordinary negotiation
    and litigation skills.  I have always found Bill to be extremely principled and

28  truthful." *Mark Brossman* (Ex. B-14).

<div align="center">31</div>

410707.01

"I have the utmost respect for Mr. Lerach.  By word and by deed, he has been a vigorous and effective advocate of behalf of CalPERS.  His legal acumen, organizational skills, litigation experience, and dogged persistence have lead to outstanding results for the retirement system.  For example, he represented over 60 investor clients (including CalPERS) in direct litigation springing from the accounting fraud at WorldCom.  Despite the fact that Worldcom itself went into bankruptcy, he and his firm successfully negotiated significant recoveries from other responsible parties.  The settlement in the Worldcom opt-out litigation remains the highest monetary recovery that CalPERS has ever received in a securities fraud action.  At the same time, I have always found Mr. Lerach's representation of CalPERS to be ethical, professional, and above reproach.

"His legal skill goes beyond obtaining monetary recoveries for his clients.  He understands the importance of the integrity of the financial markets for CalPERS and other long-term institutional investors.  Thus, he has been a vigorous supporter of shareowner rights and corporate governance reforms."  (Ex. M-11)

In recent years, Lerach also has led major litigation on behalf of institutional investors arising out of the accounting scandals at WorldCom and AOL Time Warner, as well as class action litigation on behalf of investors in HealthSouth.  The *WorldCom* and *AOL Time Warner* litigations produced hundreds of millions of dollars on behalf of a score or more of public and private pension funds.

Lerach's co-counsel in the suit by several Ohio public pension funds against AOL Time Warner, John Stock, writes:

"We worked as co-counsel with Bill and his firm representing Ohio's five public pension funds and the Ohio Bureau of Workers' Compensation in a securities fraud lawsuit against AOL Time Warner ('AOLTW').  The pension funds had lost hundreds of millions of dollars of their members' pension savings as a result of the wrongdoing of AOLTW and its management.  We worked closely with Bill, and got to know him well, over the more than four (4) years of that litigation.  Bill Lerach was the driving force in obtaining a recovery that was the largest recovery, on a percentage basis, of any across the country.  Ohio's public employees and pensioners were ecstatic with the recovery of their pension savings that Bill was able to obtain for them.  High-stakes litigation is a wonderful mechanism for revealing the true character of a man (or woman).  The challenges are constant and the pressure, at times, can seem unbearable.  The temptation to take a path of least resistance or to concede issues that are problematic can be enormous.  But not once during the entire four years of the AOLTW litigation did Bill flinch from doing his very best for our clients, no matter how painful the effort.  Indeed, we often marveled at his 'nerve' in the face of tremendous opposition.  And we came to understand how he could do the things he did—he truly

believed in the virtue of our clients' cause.  That drove him to do things that lesser men could not."  (Ex. S-16) (emphasis in original).

Among the other high-profile and important cases pursued by Lerach is the New York Stock Exchange specialist case.  There, Lerach represented CalPERS in a lawsuit against the NYSE and its specialists for various illegal practices, including "pennying" and "front-running" by which investors trading on the Exchange were cheated.  Most recently, Lerach was leading the largest and most important of the stock option "backdating" cases against UnitedHealth, again, represent CalPERS as the leader of the class.

### F.   Corporate Governance Leadership

After the 1995 PSLRA created the new era of stockholder litigation, the suits Lerach has prosecuted not only recovered unprecedented amounts of damage awards for cheated investors and consumers, but also led to significant corporate governance changes in numerous public corporations, a previously unheard of development in securities litigation and one that received widespread acclaim.  *See In Praise of Trial Lawyers—How Bill Lerach, Hated American Lawyer, Became a Corporate Governance Hero*, The Economist, July 12th-18th, 2003, attached hereto as Exhibit 1.

In recognition of his expertise in corporate governance, Lerach was appointed to the California Commission on Corporate Governance, where his dedication and objectivity have been noted.  Richard Damm, the staff Executive for the Commission, writes that Lerach:

"was always thoughtful, fair-minded and well reasoned in his explanations of current and future implications of law changes and regulatory enforcement.  In often highly adversarial and heated discussions, Bill would have the ability to recognize and offer the differing positions of public policy, his competitive interests of his business and the interests of those people he litigates against.  I, members of the Legislature and many of his most fervent opponents came to respect the time, attention and creative thought Bill proffered on behalf of a public good.  I feel he believes public responsibility is a cornerstone of a fair and just society."  (Ex. D-1).

410707.01

Professor Richard Buxbaum, a law professor at Boalt Hall and another Commission member, writes:

> "[T]he Commission was noteworthy for the spectrum of views represented among its members—defense bar, plaintiffs' bar, business leaders, academics, and appointed as well as elected public officials; and it also was noteworthy for the highly professional and earnest approach all members took to the wide range of proposed legislation and regulation—that made up its agenda for two decades. Mr. Lerach's commitment to this work not only was essential from the point of view of balance, but the way he engaged was essential for the Commission's success. He earned and kept the respect of those who would expectably disagree with him, and he was persuasive enough that his views often were accepted or at least used to modify outcomes in the Commission's reports to the various committees considering these bills and inquiries. The discussions occasionally were heated but never unprofessional, confrontational or personalized, and the usefulness of the Commission's own recommendations could not have been obtained without Lerach's highly professional participation. . . ." (Ex. B-15).

Lerach-led litigation on behalf of institutional investors has broken entirely new ground in achieving corporate governance enhancements. Robert Monks, noted corporate governance expert, writes:

> "I have spent the last twenty five years in the effort to reform the governance of American corporations . . . . When Bill Lerach approached me some ten years ago with the proposal of co-operation—I would act as governance consultant at the settlement stage of shareholder litigation—I was frankly apprehensive. This is my fiftieth year as a member of the bar. As a partner in a traditional Boston law firm, I did not view litigation as a positive strategy for my clients. As the former Chairman of the Republican party in both Massachusetts and Maine, I usually found that the largest supporters of those I was trying to defeat were trial lawyers. It is apparent that I am no longer young and if I ever wanted to make progress in corporation reform I had to [do] something different. This required an act of faith—I had to be sure that I wasn't just being used as an advertisement to attract clients and justify fees; I had to be confident that Bill would in fact jeopardize his fees by requiring defendants to do something they had never done before—make governance changes. On many occasions, we walked away from settlement conferences because no defendant wanted to be dragged into what might have appeared to be unprecedented concessions. My faith in Bill has been fully vindicated. On no occasion has he asked me to temper the governance demands that we proffer in settlement negotiations. He has pursued the reform remedy with full integrity and energy." (Ex. M-13)

Richard Bennett, a corporate governance advisor, writes:

"As a corporate governance advisor, I have had the good fortune during the past five years to work with Bill Lerach on a number of cases involving some of the biggest securities fraud allegations in history—including to Qwest, Sprint, Royal Dutch Shell, Broadcom, HealthSouth, BP, Dynegy, and many others. I have seen his passion, his commitment, his dedication to his work. I have witnessed his holding tough for his client's interests in adverse circumstances. I have seen his willingness to walk out of settlement talks that would have netted his firm enormous fees because of the inadequacy of remedies for the aggrieved, including the lack of willingness by companies to reform their corporate governance practices to protect investors going forward . . . . Further, I would offer that Bill Lerach has been a force for good in American capitalism. He has taken on the worst corporate offenders and fearlessly fought to make them accountable. His willingness to invest his sweat, his talent and his treasure in this cause has made it less likely that other frauds will be committed and has contributed to improving governance practices and systems throughout our public markets and public companies."
(Ex. B-5)

Lerach's personal commitment and tenacity in litigating against corporate excess have also had a uniquely beneficial deterrent effect on corporate behavior, leading to the creation of a new verb, to be "Lerached." C. Hugh Friedman, a noted professor and corporate counsel, writes:

". . . I am convinced that Bill Lerach's work and successes have been an extremely important and effective private supplement to Governmental enforcement of the Federal and State Securities laws throughout this country, and a beneficial force in influencing better corporate governance policies and practices. I know of many instances where the fear of being 'Lerached' has motivated a board of directors and/or corporate managers to take a more prudent and responsible course." (Ex. F-7)

Defense lawyers and corporate counselors have stated that even the possibility of a shareholder suit by a client represented by Lerach had a positive impact on corporate behavior, and has improved both corporate disclosure practices and behavior:

"Without question, many misdeeds by public companies and their officers and directors—and I saw these from the insider as a defense lawyer—would never have been uncovered or remedied except for the dedicated work of Bill and his firm . . . . Bill has always passionately believed that there was serious wrongdoing in corporate America that must be revealed, remedied and stopped. As a result of his efforts, there is a night and day difference in the disclosure and corporate governance practices of public companies from when I first started practicing law." *Tower C. Snow, Jr.* (Ex. S-9).

35

410707.01

### G.    The *Enron* Litigation

As the PSLRA changed the class action litigation landscape, Lerach continued to lead some of the largest and most important litigation in the United States.  In the early years of the new century, as corporate fraud exploded in a series of major accounting and other corporate scandals, Lerach led his firm in prosecuting several of the most important of these.  Chief among these was the *Enron* litigation on behalf of investors in that ill-fated enterprise who lost billions.  As lead counsel representing the Regents of the University of California pension fund, which had suffered a $145 million loss, Lerach led a litigation effort against the top actors at Enron, several large Wall Street banks, and large law firms.  After four years of intense litigation against these huge financial institutions represented by the largest and best defense firms in the United States, the *Enron* litigation led by Lerach resulted in a $7.2 billion cash recovery for the investors, the largest recovery for defrauded investors in history.  Lerach achieved this recovery principally against a number of large Wall Street banks including Citicorp, JP Morgan, CIBC, and others.  Lerach's colleague, Paul Howes, writes:

> "I was Bill Lerach's partner for eight years, the last six running the Houston trial office for the Enron litigation.  In October 2001 he sent me to investigate the Company's implosion.  It was not rocket science that Enron was a fraud.  What set the firm apart, as has been the case for 25 years, was his brilliance in figuring out how and why the market believed what the Company reported and which co-schemers made the fraud possible.  He was the mastermind of our scheme-liability theory against Enron's banks, which Judge Harmon accepted in December 2002 and which led Citi, JP Morgan Chase, and CIBC to settle with us in 2005, after 13 months of discovery, for $6.4 billion.  He focused our resources, on the real question:  not how Enron collapsed, but why shareholders, the market, and credit-rating agencies believed it never would.  With the Company bankrupt, Andersen, its auditor, collapsing, and the SEC's and DOJ's enforcement actions very limited, Bill's legal brilliance, professional courage, and leadership gave Enron's 1.6 million victims their only hope of some recovery."  (Ex. H-7)

The Lead Plaintiff in *Enron*, the Regents of the University of California, attest to Lerach's skill, dedication and trustworthiness.  James Holst, the Regents'

General Counsel when Lerach was retained to prosecute the Enron (and later the Dynegy) class action suits, writes:

> "My experience with Bill Lerach extends over a period of seven years and results from the participation of the Regents of the University of California in the Enron and Dynegy Private Securities Litigation Reform Act class action litigation—*Newby, et al. v. Enron Corp., et al.*, and *Regents v. Dynegy, Inc., et al.* . . . .
>
> "The outcomes in both cases fully justified the confidence placed in Mr. Lerach by the decision to seek the designation of his firm as class counsel.
>
> "Throughout *Newby* and *Dynegy*, Mr. Lerach was unfailingly conscientious in his unqualified commitment to the interests of the respective classes. He was forthcoming in his assessment of the strengths and weaknesses of the legal theories critical to recovery on behalf of the classes and demonstrated the excellent judgment we had identified as a key element in the decision to seek the lead counsel designation." (Ex. H-6)

Christopher Patti, the in-house Regents lawyer most directly involved in Enron, states:

> "Mr. Lerach's vision, tenacity, legal talent, and leadership has so far resulted in the largest recovery ever obtained in a securities fraud class action—over $7.2 billion. Mr. Lerach and his team obtained this compensation for the victims of the Enron fraud against tremendous odds. The *Enron* defendants included some of the wealthiest and most powerful financial institutions in the world, and they spared no expense in opposing the plaintiffs' claims, hiring many of the largest law firms in the United States. The primary theory on which we pursued these defendants—a theory largely, if not entirely, the product of Mr. Lerach's own thinking—was untested when the case was filed. Nevertheless, Mr. Lerach invested over $100 million of his and his firm's time and resources to pursue justice for investors. The results have been historic.
>
> "Given Mr. Lerach's reputation, the formidable legal skill I have observed during the past six years did not come as a surprise. What has struck me instead has been the sincerity of his dedication to his clients. Throughout the litigation, Mr. Lerach has maintained a determined focus on the best interests of the investor victims. Mr. Lerach has repeatedly advocated strategies that, while in the best long-term interests of his clients, were not necessarily in his own financial interest. For example, early in the litigation he resisted quick settlements with some defendants, settlements that could have relieved the substantial financial burden of the case on his firm but would not have been in the overall best interests of the class. Mr. Lerach is often described as 'aggressive,' 'forceful' (or in other terms not so nice). In my experience, however, when Mr. Lerach has taken an 'aggressive' stance, he has done so to serve the interest of his clients.

SENTENCING MEMORANDUM OF WILLIAM S. LERACH
CASE NO. CR 07-00964-JFW

410707.01

"I was also surprised to observe the deep respect in which he is held by many opposing lawyers.  It was obvious to me that after years of litigating against Mr. Lerach, many of the finest attorneys in the country recognized him as a trustworthy adversary.  In more than one instance, opposing lawyers agreed to multi-million dollar settlements on Mr. Lerach's oral assurances and felt no need to reduce the agreements to writing until it was time to present them to the court for approval.  The mistrust that is so pervasive in modern practice, such that every minor discovery agreement must be followed up by a 'confirmation letter,' was not a part of the relationship between Mr. Lerach and many of our adversaries.

"Finally . . . in my observation of him over the past six years . . . Mr. Lerach has consistently acted with honesty and integrity, and, as mentioned above, in accord with his ethical obligation to his client even when doing so may have not been in his self interest."  (Ex. P-4)

## H.    Consumer, Public Interest, and Human Rights Cases

While Lerach-led securities class action and stockholder derivative suits have been widely publicized, less well known are a series of consumer, public interest, and human rights cases which broke new ground and often achieved great results.

*Stringfellow Acid Pits*.  This huge and staggeringly complex environmental class action suit, against over 100 corporations on behalf of thousands of residents living near a leaking toxic waste dump, produced a more than $100 million recovery after years of hard-fought litigation.  Pitted against a phalanx of large corporations and insurance companies, Lerach's firm achieved a landmark recovery in this important case.  Penny Newman, the leader of the community organization which oversaw this litigation, writes:

"Thirty years ago, I and a group of other young mothers met in each other's homes to discuss our concerns over the millions of gallons of liquid toxic waste which had been poured into open pits, ponds and lagoons in a boxed canyon above our community.  The site is known as the Stringfellow Acid Pits . . . .  From this toxic site were repeated episodes of overflowing of the pooled toxic waste that flooded our homes, obvious airborne releases for many years, and later the contamination and destruction of our entire drinking water aquifer. . . .

38

410707.01

"The contamination was a real tragedy for our families, causing increased illness and even deaths from cancers and heart disease, and of course, damage to the value of our property, the only real assets any of us had. In 1984, I lead the effort to find a law firm willing to take on the more than 75 huge corporations who had dumped the millions of gallons of industrial waste into our community and which was causing so many problems . . . . We desperately needed a firm that would have the commitment and the willingness to devote enormous resources to the effort. In 1984, we met Bill Lerach and his partners. At seeing the outrageous situation our families were in, the firm stepped forward . . . .

"Ultimately Milberg Weiss Bershad Hynes & Lerach represented more than 4,000 people [in] the largest toxic tort case in the nation requiring dozens of expert witnesses and millions of dollars in out-of-pocket expenses—all covered by the firm. . . . Bill and his firm stayed with us through the entire ordeal, holding our hands and even crying with us when it got really bad. By persevering and hanging with us, we were ultimately able to settle the case for more than $110 million dollars.

"Beyond the settlement funds, which were much appreciated by the families touched by illness and monetary loss, the victory we experienced made all of us in the community feel that we had achieved justice—that ordinary people with the help of extraordinary and committed attorneys could take on powerful companies and the inept government agencies which promoted and established the Stringfellow Acid Pits—and actually win.

"It is clear to me, that without lawyers like him that are willing to stand up for the little guys, our community would have been abandoned and forgotten to suffer on our own. We could never have accomplished what we did. For his efforts and those of his colleagues who worked with us day-by-day on the case; for the friendship and respect he showed us—we will be forever grateful. (Ex. N-3)

***Vanishing Premium Litigations***. Lerach's firm represented over a million consumers who were cheated by deceptive sales practices used to market life insurance policies, the premiums on which were falsely promised to "disappear" after several years. Lerach achieved settlements providing economic relief worth well over a billion dollars. Dan Lawton, a corporate defense lawyer, describes Lerach's work on the case on behalf of his parents:

"Bill's firm . . . represented my parents [against a corporation that] defrauded thousands of life insurance policy holders . . . . The result put money in their pockets and gave them what amounts to free life insurance . . . . They and I will never forget the personal attention and care which Bill's firm demonstrated to them . . . . Bill created an institution that cares about and does something for ordinary people in a large way that no government agency, charitable organization, or

39

other entity possibly could.  There are no other attorneys I know who can say that about themselves or their own firms." (Ex. L-1).

*Marianas Islands Labor*.  This important case against several major corporations and Hong Kong entities challenged their labor practices in the U.S. territory known as the Marianas Islands.  The abusive practices of these employers were substantially curtailed in a landmark settlement—after years of litigation—including appeals to the Ninth Circuit.  The settlement included millions in payments to victims and the appointment of a human rights overseer to inspect and control Island working conditions, while Lerach's firm waived its fees.

Al Meyerhoff describes Lerach's reaction when he brought the conditions in the Marianas Islands to his attention:

> "[H]e did not hesitate.  'I want to bring that case' . . . .  He was simply offended by this abuse of power . . . there is not another senior partner at a major plaintiffs' law firm . . . that would have agreed to bring this complex and difficult litigation . . . changes were agreed to in the living . . . and working conditions . . . .  Millions of dollars in damages were distributed to the class; the firm waived all attorneys' fees . . . his work also has been deeply motivated by the exploitation of the weak by the powerful—whether victims are shareholders, elderly nursing home patients, or garment workers."  (Ex. M-6).

Warren Price, the former Attorney General of Hawaii, writes that the settlement in the Marianas Islands case

> "was due in large part to the personal efforts and skill of Bill.  Indeed, Bill was not only instrumental in gaining settlement terms that were extremely favorable to our clients, but he recommended to all plaintiffs' counsel that we waive all attorney's fees, which we did, so the plaintiffs would receive even more benefits and further financial security."  (Ex. P-9).

*Tobacco Litigation*.  This was a true landmark case, and the very first tobacco public health case, which uncovered the incriminating (and now infamous) tobacco industry nicotine addiction/teen targeting documents.  The case also resulted in ending the use of the "Joe Camel" advertising figure, after Lerach argued and won an important appeal in the California Supreme Court.  *See Mangini v. R.J. Reynolds*, 7 Cal. 4th 1057 (1994).  Attorney Alan Caplan writes:

"The hard-fought litigation required sifting through over seven hundred boxes of R.J. Reynolds documents sent directly to Mr. Lerach's office, while attorneys reviewed millions of pages of documents offsite.  Ultimately, the case settled in 1997—six years after being filed; R.J. Reynolds agreed to terminate the Joe Camel campaign, and pay $10,000,000 for anti-smoking campaigns throughout California.  Most impressive to me was that Mr. Lerach opposed settlement unless all the previously confidential internal documents produced in the litigation were released to the public.  On January 15, 1998, one month after R.J. Reynolds finally agreed to that condition, the House Committee on Government Reform (now the House Committee on Oversight and Government Reform) released thousands of pages of those previously confidential documents produced in the litigation, noting that they were the first detailed revelations of 'how the tobacco industry exploits our children.'. . . This outcome would not have happened without Mr. Lerach's enthusiasm, zeal and commitment in taking on risky and expensive public interest cases . . . .  It is not grandiose to conclude that the injunction on the cartoon advertising prevented innumerable teens from becoming addicted to cigarettes and suffering unhealthy and even deadly consequences.  The Joe Camel litigation is a profound example of how Mr. Lerach's determination in litigation has benefited the general public."  (Ex. C-2).

The firm also helped represent many California cities and counties in the later damage suits against the tobacco companies, enabling them to receive 50% of the multi-billion dollar tobacco settlement with California, a major financial benefit to these governmental entities, the only state subdivision entities to achieve financial recoveries in the tobacco litigation in the United States.

Louise Renne, who was the San Francisco City Attorney, writes:

"Over the years I have come to admire and respect Bill Lerach for his contributions to the legal profession and the excellent legal work he has done on behalf of so many.  The Bill Lerach I know is a person of character and integrity, who cares deeply about social justice . . . . The first case in which I hired Bill Lerach and his firm was in the 'Joe Camel' case, in which we sued the tobacco industry for its use of the 'Joe Camel' ad in targeting children and young people and encouraging them to smoke.  As is well-known, the case became landmark litigation and was successful in establishing one of the first reforms in the tobacco industry.  At about the same time, our office led a coalition of California cities and counties in suing the tobacco industry for a number of its other business practices which severely impacted public health.  We filed this litigation before many state Attorney Generals had filed suit, and I again turned to Bill Lerach and his firm for counsel.  As a result of that litigation, when the final national tobacco settlement was reached, half of the proceeds designated for the State of California go to California local governments for their use.  (In the case of San Francisco, we are rebuilding a public hospital with the proceeds.)"  (Ex. R-4).

41

410707.01

***WWII Pacific Theater POW Litigation***.  Lerach vigorously pursued litigation on behalf of American POWs, including victims of the Battan Death March, but lost after years of effort, due to release language agreed to by the United States in the U.S.-Japanese peace treaty.  David Casey writes:

> "I had the opportunity to observe [Lerach's] legal efforts in . . . the World War II Slave Labor Litigation brought against Japanese companies that abused prisoners of war in the Pacific arena . . . .  The World War II Slave Labor Litigation, while unsuccessful, was an example of one of his numerous attempts to do the right thing for a horribly devastated group of people despite overwhelming odds." (Ex. C-6)

***Holocaust Slave Labor/Life Insurance Litigations***.  In these highly acclaimed lawsuits, Lerach sued large international industrial corporations (*e.g.*, Bayer, Mercedes-Benz, Ford) and insurance companies for exploiting prisoners of war and for refusing to pay death benefits to victims of the Holocaust.  The cases produced huge financial settlements for living victims and heirs of the dead.

***California Handgun Litigation***.  Cities and counties in California hired Lerach's firm because of the escalating killing and the enormous cost handgun violence was imposing on local budgets.  Due to healthcare, police, court, and security expenses, California cities and counties were suffering huge deficits in large part due to disreputable distributors of handguns like the "ring of fire" manufacturers in Los Angeles County.  The case put the "ring of fire" out of business, as well as the worst of the other gun distributors.  *See* Letter of Hon. Vincent Di Figlia (Ex. D-3) ("I was assigned the coordinated gun control cases. . . . The legal representation provided in the coordinated gun cases, as well as other litigation in which Mr. Lerach or his firm participated before me, was always of the highest quality professionally and ethically.")

***Nationwide/Veterans Insurance Case***.  This class action was one benefiting U.S. military veterans (or their surviving spouses) against an insurance company that had deceptively marketed life insurance policies to young men serving in Vietnam and then later reneged on the coverage.  An excellent settlement was

obtained.  *See* Letter of Hon. James R. Milliken (Ret.) (Ex. M-10) ("Mr. Lerach appeared before me on several matters . . . .  He was always very well prepared, a fine lawyer and was highly ethical and honest in all his dealings with his adversaries and the Court. . . .  [H]e and his partner, Patrick Coughlin, tried a complicated insurance bad faith class action in my courtroom.  They were successful . . . and obtained an excellent result for their clients.")

*Nike Slave Labor Litigation*.  This suit challenged false advertising by a large company claiming to be socially responsible and progressive while, in fact, using slave labor to produce much of its product.  Lerach's firm won a landmark California Supreme Court decision leading to a settlement requiring improved conditions for workers in Nike factories.

*California DMV Refund Litigation*.  This class action on behalf of new California residents who were charged discriminatory "smog" certification/compliance fees resulted in the practice being declared unconstitutional and the return of over $300 million to cheated consumers.  Despite suing the State successfully in this case, California's university system later hired Lerach to represent it and other defrauded investors to get their money back in the Enron case.  Lynn Schenk explains:

> "During my tenure as chief of staff to Governor Davis, Bill and his firm represented a class against the State of California.  The case took many twists and turns and it became widely known that the Governor and I were at odds with Bill's view.  At the same time, the University of California was seeking counsel to represent it in some Enron related litigation.  Bill's firm was among the finalists being considered by the University . . . .  Several of the Regents and representatives of the University's administration called me to say that, while the Lerach firm was by far the most superior to represent the University against Enron, they were concerned the Governor would oppose such a decision.  I immediately responded that the Governor and I had the highest regard for Bill.  We knew of his tremendous skills as an advocate, his effectiveness in representing his clients and his reputation for excellence.  The University deserved the best representation and we understood that Bill Lerach could and would provide it.  When I told the Governor what I had said, he concurred without hesitation.  We knew his integrity and honor was such that he would not allow one case to influence the other."  (Ex. S-4)

43

## I.     Lerach's Generosity

Lerach's career and the landmark victories described above have brought him great financial success.  In keeping with his character, his generosity has kept pace with this success.  He established the Lerach Family Scholarship Fund at the University of Pittsburgh to provide financial aid to deserving law students.  According to Professor Herring, the former Dean of the School of Law, Lerach's "gift has had a dramatic impact here and it stands as testament to his strong commitment to give back to the school that gave much to him."  (Ex. H-3).

At his behest, Lerach's law firms have also made several million dollars of charitable contributions to such diverse entities as the Holocaust Museum in Washington, DC and other Holocaust organizations, Catholic charities, and immigrant worker organizations.  Contributions deserving special mention include: American Friends of the Hebrew University ($25,000); America Rights at Work ($50,000); Armed Services YMCA ($45,000); Catholic Cardinal's Committee for Charity ($100,000); Catholic Charities USA ($100,000); Center Citizens Education Fund ($100,000); Cornell University ($50,000); Economic Policy Institute ($50,000); Elder Help of San Diego ($12,500); Foundation for Consumer Rights ($87,000); Immigrant Workers Citizenship Project ($100,000); Jobs With Justice Fund ($100,000); Los Angles Center for a New Economy ($50,000); National Immigration Forum ($250,000); Partnership for Working Families ($50,000); ProKids Golf Academy ($50,000); Research Foundation for Ovarian Cancer ($15,000); San Diego Volunteer Lawyer Program ($9,000); TransAfrica Forum ($200,000).  In addition, Lerach contributed over $100,000 to a relief fund for victims of Hurricane Katrina put together by one of his partners.  Since the founding of the Lerach Coughlin firm in mid-2004, that firm made some $2.6 million in charitable contributions.

In addition, Lerach's firm made the following contributions out of its fees from the tobacco litigation:

410707.01

***San Pasqual Academy***.   The firm contributed $2,000,000 for a high school for children without parents to live in a structured environment.  The firm's work on the tobacco cases showed that homeless children or children without parental figures were several times more likely to smoke.  The firm donated money to this Academy, which provides a structured environment for children without parents able to supervise them.  Retired Superior Court Judge James Milliken describes the impact of Lerach's gift:

> "Mr. Lerach and his firm contributed $2 million to the school to help us defray costs of remodeling the school and dormitories.  San Pasqual Academy currently has 140 students and is the only boarding school established exclusively for foster children in the country.  Our success with San Pasqual is directly related to Mr. Lerach's extraordinary gift.  There were no other gifts that approached the magnitude of the gift . . . ."  (Ex. M-10).

***University of California, San Diego.***   The firm contributed $500,000 to fund further tobacco research, especially concerning teen smoking.

Lerach, who has a passionate interest in tribal art, has also been a generous supporter of the San Diego Museum of Man.  Dr. Mari Lyn Salvador, the Museum's Executive Director, and Ms. Sharon Smith, the Museum's Director of Development, describe the impact that Lerach's support has had on the Museum:

> "Our mission here at the Museum of Man is to *teach people about people*.  Mr. Lerach's support has been invaluable to fulfilling our mission.  We originally met Mr. Lerach . . . as we were preparing an exhibition of contemporary art from Africa.  Upon learning about the project, Mr. Lerach . . . provided major financial support for the exhibition, which has been seen by nearly 150,000 people—including thousands of K-12 students, many from underserved communities . . . Mr. Lerach also loaned the Museum two pieces of sculpture from his personal collection, pieces that would have been impossible for us to obtain, and which add immeasurably to the exhibition.  He and his wife also graciously opened their home for a reception for the Museum . . . .  Mr. Lerach has also provided financial support to our curatorial department, expanding our ability to care for the 150,000-plus artifacts and photographs that we hold in trust for the people of San Diego . . . .   In a very short time, Mr. Lerach has made a very real difference to the San Diego Museum of Man and to the thousands of people of all ages who visit the Museum."  (Ex. S-1)

Lerach has also supported other community organizations, in particular those devoted to helping abused women and animals.  Evelyn and Mary Weidner,

45

who run a nursery in Encinitas, California and came to know Lerach through his love of plants and gardening, describe one such example:

> "We first became acquainted with Bill about 10 years ago.  Bill has a great love of plants and actively works in his own garden.  He thus came in as a good customer and became a good friend . . . .  I also serve on the board of a local Social Service agency, The Community Resource Center here in north San Diego County.  They annually do a Holiday Basket program providing food, clothes, and toys for upwards of 1,000 families today.  About five years ago like all non profits we were struggling to raise money for the Holiday Basket program.  I took a chance and sent down a personal letter asking for whatever donation might be possible.  Within days a very nice check arrived from Bill.  That was much appreciated.  Bill does not forget to take care of people who, for whatever reasons need a helping hand, so when Bill and Michelle were married recently he made the Community Resource Center Women's Shelter one of two charities for wedding guests to give to instead of buying gifts for the Lerachs." (Ex. W-4).

Ben Stein describes another example of Lerach's generosity.  After he did a piece for CBS on pets abandoned in New Orleans in the aftermath of Katrina, Lerach— without saying a word—sent a $10,000 donation to be used for the International Fund for Animal Welfare.  *See* Ex. S-14.

Over the years, Lerach has also been very generous to the people with whom he has worked.  The letters of support are filled with examples of Lerach helping his employee in ways great and small.  Kathryn Lichnovsky, Lerach's long-time secretary, writes:

> "Bill has been more than generous to me, as he is with everyone.  He loaned me money when bad circumstances came up after my great aunt passed on.  When he bought a new car, he gave me his Maxima instead of trading it in (I didn't ask for it; he knew I was driving a crummy older car).  He invited my teenaged sons to use his condo to go snowboarding in Steamboat Springs, Colorado, if he wasn't using it . . . .  No other employer treats someone like he does—consistently generous and caring."  (Ex. L-10).

Nancy Juda writes that "Bill is also one of the most generous people I have ever met.  When I needed some extra money to put a down payment on my first home a couple of years ago, he graciously offered to lend me whatever amount I needed.  I know that I am only one of many that he has helped out over the years." (Ex. J-2).

1 ████████████████████████████████████

2 █████████████████████████████████████████

3 ████████████████████████████████

Henry Rosen, who has known Lerach since he joined Milberg Weiss as an associate in 1991, details several other examples of Lerach's generosity to those who work around him:

> "Over the years, I have also come to appreciate Bill on a personal level and have witnessed his sincere and extreme generosity. Although space does not permit me to list every kind act I have witnessed, there are several examples I would like to share. Within my first five years of working with Bill, the firm experienced an unexpected loss. A secretary with whom I worked closely committed suicide for no apparent reason. Everyone was shocked as this woman was an excellent secretary, never mentioned any personal problems or troubles, and had two fairly young children. Bill responded to this tragedy by setting up a college fund for the two children so that despite losing their mother, they would not miss out on the opportunity to obtain a higher education.

> "Bill's generosity was also felt throughout the firm when employees (lawyers and staff alike) experienced debilitating illness. In addition to the firm's generous sick leave policies, I remember two specific instances in which employees were battling cancer. Bill made sure these employees received full pay even though they missed more than a full year of work before returning to the firm.

> "A third example that I would like to share that also demonstrates Bill's good character is his willingness to personally loan dozens of employees funds as down payments on their first homes. While owning a home is part of the American dream, purchasing a house is nearly impossible for many in Southern California despite having a good job. I relocated to San Diego to accept a job at the firm and after working as an associate for two years, Bill personally lent me the down payment interest-free so that I could purchase a home for my family. I know that Bill also helped dozens of other people at the firm in the same position so that they too could purchase their own homes. Bill's generosity is highlighted by the fact that he never collected a penny in interest from these loans.

> "Collectively I believe these examples of Bill's kindness are in part why working for him was such a great experience. His generosity pervaded the firms and was one of the main reasons I found my career working with him so rewarding. I will never forget these life lessons from Bill and feel very lucky to be able to call him a friend in addition to a colleague." (Ex. R-7).

410707.01

A final example of Lerach's generous and giving spirit comes from Hector Millan, who came to work for Lerach in the copy room of Milberg Weiss in 1982. Millan writes:

> "At the time I was hired, my mother was Bill's housekeeper, and I remember my mother speaking ever so fondly of him.  She always spoke about how kind and generous he was to her, always opening up his home to her and my family whenever we needed it.  Many times Bill would get home (either in Del Mar or Rancho Santa Fe) from a very busy day at work and would either drive my mother to the train station after she had finished her work at his house or would at times, depending on the weather, actually drive her all the way back down to Barrio Logan where we lived at the time.  Bill is a very kind and compassionate person and has an extremely 'big heart.'"  (Ex. M-8)

## VI.    ACCEPTANCE OF THE PLEA AGREEMENT

The Plea Agreement before the Court is the result of intense negotiations between attorneys for Lerach and for the government.  Those discussions were initiated by Lerach at a time when no charges were pending against him.  The Agreement itself was achieved in no small part due to the assistance, in the role of mediator, of another federal judge.  Because the parties have significantly different views of the evidence and the applicable law, certain significant issues had to be addressed and compromised during those negotiations.  The government's evidence of Lerach's active participation in paying referral fees in cases where Cooperman was a plaintiff all pre-dates 1999, and thus involves conduct and potential charges which may be time-barred.  While the government would have attempted to establish Lerach's criminal responsibility for the allegedly foreseeable conduct of others which occurred subsequent to 2002, there is no evidence of chargeable conduct by Lerach within the limitations period.

Also, even the evidence of Lerach's direct involvement with payments to Cooperman was contested.  While Cooperman claims a direct cash payment was made, Lerach adamantly denies this.  Lerach's position has been corroborated by the only other person present at that meeting—Cooperman's ex-wife—who has no

1  stake in the matter.  She has testified under oath that Cooperman—who has other

2  pervasive, serious credibility problems—lied about the cash payment.

3       The fact of the matter is that, after 1995 and certainly by 2000, Lerach's

4  practice and his client base had changed dramatically.  He had no active

5  involvement in substantive charged conduct taking place in 2002 or later.  Thus,

6  the viability of a government case against Lerach based upon older conduct would

7  have rested entirely on legal theories relating to conspiracy and on-going conduct,

8  and the effect of that type of allegation on the statute of limitations calculation.

9  Lerach had substantial defenses that he could have asserted.

10      Moreover, and of equal significance, the Guidelines for the crime to which

11  Lerach has pled guilty changed effective November 2003.  *See* U.S.S.G. §2J1.3.

12  The post-2003 Guidelines set an offense level of 14 for the crime charged, but the

13  pre-2003 Guidelines set a level 12 for the same crime.  That change—and the

14  addition in 2003 of a two-level Specific Offense Characteristic—had a substantial

15  effect on Lerach's potential exposure.  These factors, as well as Lerach's

16  willingness to come forward and enter a plea of guilty, face a potential loss of

17  liberty, and pay $8 million in fines all contributed to the compromise agreement

18  that the parties eventually hammered out.

19      The Presentence Report supports the compromise agreement.  The Probation

20  Office acknowledged that both sides had credible arguments regarding criminal

21  responsibility for post-2002 conduct.  However, after considering the arguments of

22  both sides and reviewing the evidence, the Probation Office concluded that absent

23  evidence of active misconduct by Lerach after November 2003, the earlier

24  Guidelines apply, yielding a sentencing range of 15-21 months, well within the 12-

25  24 months sentencing range agreed to in the Plea Agreement.

26      Section 6B1.2(c) of the Sentencing Guidelines provides guidance for the

27  circumstances under which the Court should accept a plea agreement, such as the

28  one presently before the Court, that includes a specific sentence.  Pursuant to that

49

1   section, the Court may accept an agreement if the court is satisfied either that (1)

2   the agreed sentence is within the Guideline range, or (2) the agreed sentence

3   departs from the applicable guideline range for justifiable reasons.  In this case,

4   both conditions are met.

5         Utilizing the proper November 2001 version of the Guidelines, Lerach's

6   total offense level is 14, and his Criminal History Category is 1, yielding a

7   sentence of 15-21 months.  Moreover, the absence of proof of conduct occurring in

8   November 2003, or later not only reduces Lerach's Guidelines exposure, it also

9   potentially provides a complete defense.  If the government cannot prove conduct

10  attributable to Lerach subsequent to November 2002, any prosecution of him at all

11  for these charges would arguably be time-barred.  In this regard, it is important to

12  note that the Information charges no conduct after 2002 and the only overt act

13  admitted by Lerach in connection with his plea of guilty occurred in 1996.  The

14  agreement tendered by the parties in this case therefore satisfies both prongs of

15  Section 6B1.2(c).

16        Moreover, it is a tenet of our justice system that the adversarial process

17  produces a fair and just result.  That maxim applies here.  Highly skilled,

18  aggressive and ethical federal prosecutors conducted a lengthy investigation,

19  evaluated its fruits, and then participated in lengthy and detailed negotiations with

20  counsel for a defendant who they may never have been able to convict and, with

21  the assistance of a federal judge as mediator, worked out a plea agreement which

22  embodies a fair and just outcome.  After careful review of the Plea Agreement, the

23  Presentence Report, and the submissions of the parties, we respectfully urge the

24  Court to accept the Plea Agreement and then address the appropriate sentence for

25  Lerach.

26  **VII.   AN APPROPRIATE SENTENCE**

27        Under the principles set forth in *Gall*, and under the facts presented here, the

28  Court is well within its discretion to impose the sentence requested by Lerach.

SENTENCING MEMORANDUM OF WILLIAM S. LERACH
CASE NO. CR 07-00964-JFW

Lerach's misconduct was serious and an insult to the judicial system.  While his own direct personal involvement in the wrongful conspiracy was limited, it nevertheless constituted criminal conduct.  He has accepted responsibility for that wrongful conduct and has already suffered significantly for it.

Lerach's crime is not something that he has ever sought to minimize.  It did however, occur a number of years ago, under a class action regime that was largely eliminated in 1995, and did not harm the interests of Lerach's clients in any way.  Moreover, Lerach has no criminal history.  In fact, excluding these events, he has lived an exemplary life protecting the people he represented, helping many others, building a major law firm, and creating opportunity and jobs for hundreds of persons.  His conduct in recent years demonstrates there is no need to deter any further criminal conduct by him or to protect the public from further crimes by him.  Thus, at bottom, the real issue is what sentence is necessary but "not greater than necessary" to "provide just punishment for the offense" within the terms of the Plea Agreement.

Lerach's guilty plea and loss of his bar license, coupled with his retirement from legal practice, end his legal career.  As many who have written the Court have noted, this is punishment beyond description to a man who loves the law and has pursued it with a vision, passion and excellence many view as unique.  The loss of his law license, the severe $8 million financial penalty agreed upon, and the public shame and humiliation attendant with these proceedings, all constitute tangible, substantial punishments for Lerach.  In addition, he faces a period where he will lose his personal liberty.

All of these factors present substantial justification for the Court's acceptance of the Plea Agreement and for imposition of a sentence of 12 months: six months incarceration at FCI Lompoc followed by six months of home confinement, fashioned so as to permit Lerach to play an active role in the

University of Pittsburgh School of Law's educational program beginning in January 2009, as detailed in Dean Crossley's letter (Ex. C-16).

In closing, we ask the Court to consider the words of several people whose lives Lerach has touched and positively influenced as it decides upon an appropriate sentence.

"Our country needs more people like Mr. Lerach . . . . to help put a stop to corporate crime and stop the large corporations and banks from stealing everything from the poor, lunchpail carrying people . . . ." *Charles Prestwood* (Ex. P-8)

"[I]n sanctioning Mr. Lerach with the appropriate sentence, I trust you will punish the individual and not just the crime.  Please consider the whole of Bill Lerach's life accomplishments and not just those that crossed the line into criminal wrongdoing . . . ." *Hon. Dickran Tevrizian* (Ex. T-1)

Dated: January 28, 2008                          KEKER & VAN NEST, LLP

By: /s/ John W. Keker
    JOHN W. KEKER
    ELLIOT R. PETERS
    WENDY J. THRUM
    BROOK DOOLEY
    Attorneys for Defendant
    WILLIAM S. LERACH

52